**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

CARLA CARPINO ROSARIO,
  *Plaintiff*,
  v.
CALIFORNIA PIZZA KITCHEN, INC.,
  *Defendant*.

No. 3:23-cv-00890-MPS

## RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Carla Rosario brings this civil rights action seeking damages against her former employer, California Pizza Kitchen, Inc. ("CPK"). Rosario alleges that CPK violated her rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the Connecticut Fair Employment Practices Act ("CFEPA"). CONN. GEN. STAT. § 46a-60. Specifically, Rosario brings claims of gender discrimination and retaliation under those statutes. CPK has moved for summary judgment on all claims under Federal Rule of Civil Procedure 56. ECF No. 36. For the reasons set forth below, I GRANT CPK's motion.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

The facts below are taken from the parties' Local Rule 56 Statements and are undisputed unless otherwise noted. ECF Nos. 35-2, 43-1.

### A.  Facts

CPK hired Rosario as a senior manager in the Foxwoods Casino location on September 14, 2021.  ECF No. 43-1 ¶¶ 1, 2. At the time of her employment, both Ryan Tranka (senior manager) and Mike Avery (manager) were also working at the Foxwoods Casino location. *Id.* ¶ 3. When Rosario was hired, she was given a copy of CPK's Policy Against Harassment, Discrimination,

Retaliation and Workplace Violence. *Id.* ¶ 6. That policy "explicitly states" that Rosario "should report any possible violations." *Id.* ¶ 8.  On March 20, 2022, Tranka "raised his voice at [Rosario] during a busy shift in which the kitchen was short-staffed."[1] *Id.* ¶ 11. In response, Rosario complained to her manager, who then filed Rosario's complaint with Human Resources. *Id.* ¶ 10. Upon receiving Rosario's complaint, Senior People Relations Manager Nancy Aguilar investigated the incident. *Id.* ¶ 17. At the conclusion of the investigation, Tranka was "coached" and "issued a written warning for raising his voice." *Id.* ¶ 18.

On April 15, 2022, there was an altercation between CPK employee Zachary Ridenour and a customer. *Id.* ¶¶ 21-23. Avery told Ridenour to go home, prompting an argument between Rosario and Avery. *Id.* ¶ 21. Rosario and Avery proceeded to yell at each other.[2] *Id.* ¶ 27. After the argument, Rosario informed the general manager as to what transpired. *Id.* ¶ 28. She also sent a text to both the general manager and the regional manager alleging that Avery created a hostile work environment and requested a leave of absence, which was eventually granted. *Id.* ¶¶ 30, 32. On April 16, 2022, Rosario filed a complaint with Human Resources, which CPK again assigned to Aguilar to investigate. *Id.* ¶ 33. Rosario's complaint alleged that (1) "Avery yelled at her over the [employee] incident" and that (2) "Avery created a hostile work environment." *Id.* ¶ 34. Rosario "did not specifically claim [the hostile work environment] was related to her gender." *Id.* Rosario returned to work on April 22, 2022, while Aguilar's investigation was still ongoing. *Id.* ¶ 36.

---

[1] Rosario disputes CPK's characterization of this incident as "the Tranka Incident." ECF No. 43-1 ¶ 11. Rosario argues that, according to her testimony, "Tranka screamed at her and acted aggressively toward her on a regular basis." *Id.*

[2] Specifically, "Mr. Avery [ ] raised his voice and yelled 'you don't do anything here!' Ms. Rosario responded by yelling back 'are you serious? I'm tired of your shit.' Mr. Avery responded by yelling 'why don't I just leave, and you do my job.'" *Id.* ¶ 27.

On April 27, 2022, Rosario requested another leave of absence after her son suffered a medical emergency. *Id.* ¶ 37. CPK granted the leave of absence. *Id.* ¶ 38. During this time, CPK completed its investigation into Rosario's complaint. *Id.* ¶ 39. Aguilar concluded that both Rosario and Avery raised their voices during the altercation and that Avery's "general approach to all employees, regardless of gender, was too aggressive." *Id.* ¶¶ 40, 41. "However, CPK was not able to confirm that Mr. Avery treated [Rosario] differently because she was a woman." *Id.* ¶ 42. Avery was issued a written warning, reminded about CPK's no-retaliation policy, and counseled on his approach with employees generally. *Id.* ¶ 43. "Avery understood that he should not have raised his voice and stated that he would continue to work on his approach." *Id.* ¶ 44.

On May 11, 2022, Aguilar called Rosario to inform her that her allegations were partially confirmed and that CPK had counseled Avery. *Id.* ¶ 46. Aguilar than asked Rosario when she expected to return to work. *Id.* ¶ 47. Rosario informed CPK that she would not return to the Foxwoods location while Avery was there.[3] *Id.* ¶ 48. Aguilar reassured Rosario that the matter had been addressed and that if Rosario continued to feel uncomfortable working with Avery, CPK could transfer her to the Westfarms Mall location. *Id.* ¶¶ 49, 50. In a subsequent email exchange, Rosario refused to transfer to the Westfarms Mall location or work with Avery. *Id.* ¶ 53. Rosario continued to assert that returning "to work with Avery created a hostile work environment and retaliation." *Id.* ¶ 56. Notwithstanding Rosario's objections, Aguilar provided Rosario with her schedule for the upcoming week and informed her that CPK expected her to return to work on

---

[3] CPK contends that Rosario refused to work while Avery remained employed. *Id.* ¶ 48. Rosario argues that she would not return to work if Avery was working *at the same time*. *Id.* ¶ 48 (Plaintiff's Response). The record does not clearly support either party's position, as both Rosario and Aguilar articulated Rosario's refusal using vague language. For example, in a May 14, 2022 email from Rosario to Aguilar, Rosario writes, "You asked if I would return to Foxwoods and I again said *I will not work with Michael Avery*," ECF No. 35-5 at 32 (emphasis added), and in a May 19, 2022 letter from Aguilar to Rosario, Aguilar writes, "During our conversation on Friday, May 13th, you stated you had no intention to return to the Foxwoods Casino CPK location *as long as the employee about whom you complained, was still there*." ECF No. 43-3 at 2 (emphasis added).

May 24, 2022. *Id.* ¶¶ 54, 58. "On May 24, 2022, [Rosario] did not come to work during her scheduled shift, nor did she report for her shifts on May 25th, 26th, 27th, or 28th." *Id.* ¶ 60. "On May 28, 2022, Ms. Aguilar emailed [Rosario], informing her that CPK was separating her employment at CPK based on her failure to report to work . . . ." *Id.* ¶ 62.

### B. Procedural Background

On July 5, 2023, Rosario filed suit against CPK seeking compensatory and punitive damages. Her complaint alleges that CPK discriminated against her on the basis of her gender in violation of Title VII of the Civil Rights Act of 1964 and CFEPA. ECF No. 2 (Counts One and Three). It also alleges that CPK retaliated against her in violation of those same statutes. *Id.* (Counts Two and Four). Though CPK answered the complaint, ECF No. 15, it never filed a motion to dismiss. After the completion of fact discovery, CPK moved for summary judgment on all four counts. ECF No. 36.

## II.    LEGAL STANDARD

"Summary judgment is appropriate only if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014) (internal quotation marks and citations omitted). In reviewing the summary judgment record, a court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013). "A genuine dispute of material fact exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013). The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). If the moving party carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact. More specifically, it must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). "Where no rational finder of fact could find in favor of the nonmoving party because the evidence to support its case is so slight, summary judgment must be granted." *Id.* (internal quotation marks omitted).

## III.    DISCUSSION

Though Rosario brings her discrimination and retaliation claims under both Title VII and CFEPA, the analysis is the same under either statute. *See Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 556 (2d Cir. 2010) ("The analysis of discrimination and retaliation claims under CFEPA is the same as under Title VII."). Accordingly, I do not distinguish between the federal and state law claims, and I treat each set of claims under a single header (i.e., "discrimination" and "retaliation").

### A.  The Discrimination Claims

#### 1.  *Prima Facie* Case

When determining whether summary judgment should be granted against a plaintiff alleging discrimination, courts apply the burden-shifting framework provided by *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-03 (1973). Under that framework, the burden first falls on the Plaintiff to show "that (1) she is a member of a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination." *Bart v. Golub Corp.*, 96 F.4th 566, 570 (2d Cir. 2024)

(internal quotations omitted). Here, the parties dispute whether Rosario has satisfied the third and fourth elements. Rosario argues that her termination "qualifies as an adverse employment action," ECF No. 43 at 7, and that her "termination occurred under circumstances giving rise to an inference of discrimination." *Id.* at 9. I agree with Rosario that her termination was an adverse employment action, but I conclude that she has not demonstrated that the circumstances of her termination suggest discrimination.

CPK argues that "[g]iven the fact that Plaintiff's employment was separated *purely because she failed to return to work*, she cannot claim that she suffered an adverse employment action." ECF No. 35-1 at 19 (emphasis in original). CPK is mistaken. Termination is plainly an adverse employment action. *Edelman v. NYU Langone Health System*, 141 F.4th 28, 45 (2d Cir. 2025) ("Termination constitutes an adverse employment action under Title VII.") (internal quotations and alterations omitted). Of course, the reason Rosario was fired matters, but it matters at other stages of the inquiry. Because Rosario was fired, she suffered an adverse employment action.[4]

Nonetheless, Rosario has failed to submit evidence suggesting that the circumstances of her termination give rise to an inference of discrimination. Rosario primarily relies on two pieces of evidence to demonstrate gender animus. The first is her own testimony, in which she claimed that her termination was the result of gender discrimination. ECF No. 43-6 at 15. The problem is

---

[4] Rosario argues that, in addition to her termination, the bouts of yelling she suffered from Tranka and Avery (which Rosario characterizes as "harassment and intimidation") amount to an adverse employment action. *See* ECF No. 43 at 6 ("When an employee's opinion is discounted and ignored because of their gender . . . and male managers harass and intimidate the employee, the conditions of the workplace have been materially altered."). I disagree. While the record suggests there is a factual dispute over the amount of yelling Rosario was subjected to, this dispute is not a material one. That is because yelling, without more, does not constitute an adverse employment action. *Richards v. Dep't of Educ. of City of New York*, No. 21-cv-338, 2022 WL 329336, at *9 (S.D.N.Y. Feb. 2, 2022) (citing cases). Instead, in the context of a Title VII discrimination claim, an adverse employment action requires a "materially adverse change in the terms and conditions of employment . . . ." *Joseph v. Leavitt*, 465 F.3d 87, 90 (2d Cir. 2006).

that this testimony is vague and conclusory and does not address the reasons for her termination. For example, Rosario points out that the male managers treated each other with respect, i.e., they did not yell at each other. *Id.* at 10 ("I didn't see anybody else, managers getting screamed at and being treated the way I did, except for me. They treated each other just fine but not me.")

And when she was asked why she believed her termination was discriminatory, she did not discuss her termination at all:

> Question: Okay. So, why do you believe your termination was the result of gender discrimination?
> Answer: Well, I was, you know, the only female in there complaining and all these things were happening to me, and yet they said, which wasn't divulged to me, that they took action, they did this, they did that, which they never divulged to me what happened or what not happened, whatever, and that they take this matter seriously. Well, I had been reporting it third week in, and nobody seemed to take it seriously then, and it just kept happening and happening and happening, so yes. I believe it was gender discrimination, and I believe it was retaliation against me.

*Id.* at 15. This testimony suggests that her gender discrimination claim is based not on her termination but instead on what she viewed as CPK's lack of response—or inadequate response—to her complaints about the conduct of her male co-managers. But the company's alleged inadequate responses to her complaints are not themselves adverse employment actions. *See Hayes v. Kerik*, 414 F. Supp. 2d 193, 203 (E.D.N.Y. 2006) (plaintiff's allegation that employer "failed to properly investigate her . . . complaint" did not constitute adverse employment action). Further, Rosario has submitted no evidence that CPK's response to any complaints by similarly situated male managers was any different.

Apart from all this, her testimony about her complaints and CPK's response was vague and conclusory. *See, e.g.*, *id.* at 7 (Question: ". . . So when did you actually report Ryan's conduct?" Answer: "To HR?" Question: "Ever." Answer: "I don't remember the exact time. I reported it many times. I don't remember exact dates."); *id.* at 8 (Question: "Okay. How many

times do you think you reported [Tranka's conduct]?" Answer: "I mean, I don't know."
Question: "Well, give me an idea. Was it five? Was it 20? How many times?" Answer: "I can't
positively answer that. I mean, approximately, I don't know, six, seven times. I don't know.");
*id.* at 15 ("[Y]et they said, which wasn't divulged to me, that they took action, they did this, they
did that, which they never divulged to me what happened or what not happened, whatever, and
that they take this matter seriously."). And she points to no evidence suggesting any link between
her treatment by her co-managers and her termination. She does not suggest that Tranka or
Avery or anyone else she worked with at the Foxwoods location had anything to do with her
termination, which, for all the record shows, was carried out by a female Human Resources
employee.

The second piece of evidence offered by Rosario is the affidavit of Shelby Chiangi, a
former CPK employee. ECF No. 43-2. According to the affidavit, Chiangi worked at CPK "for a
few months," during which she observed Avery sexually harass female employees and give
preferential treatment to female employees he was sleeping with. *Id.* at 2. But the "affidavit" is
procedurally improper and, in any event, does not support Rosario's disparate treatment claim.
First, the document, which is entitled "Affidavit of Shelby Chiangi" is not, in fact, an affidavit.
*Black's Law Dictionary* defines "affidavit" as "[a] voluntary declaration of facts written down
and sworn to by a declarant, [usually] before an officer authorized to administer oaths." *Affidavit*,
BLACK'S LAW DICTIONARY (12th ed. 2024). Here, the document states only that "I, Shelby
Chiangi . . . do hereby make the following statement freely and openly, to the best of my
knowledge, without threat or promise, knowing it may be used in a court of law. I am over the
age of eighteen . . . and understand the obligations of an oath." ECF No. 43-2 at 2. There is no
representation in the document that Chiangi swore an oath, and the document is not notarized.

The space for the notary public's signature has been left blank. Nor is it a declaration of the kind that may lawfully substitute for an affidavit because it does not say that it was subscribed to under penalties of perjury. *See* 28 U.S.C. § 1746. Consequently, it does not constitute evidence I may rely on in deciding a motion for summary judgment. *See* Fed. R. Civ. P. 56(c)(1), (c)(2), and (c)(4). It is, instead, unauthenticated hearsay.

Second, according to CPK, Rosario did not identify Chiangi in her disclosures or discovery responses, and she did not disclose the document in discovery. Though CPK has not substantiated these allegations, if true, the allegations amount to a violation of Federal Rule of Civil Procedure 26.[5] Third, the document is vague and rife with hearsay. *See, e.g.*, ECF No. 43-2 at 2 ("I started to see my name on the schedule a little more, but then they would call me off and say they did not need me to come in."); *id.* ("I heard from other employees that she was sleeping with Mike . . .").

Finally, and most importantly, the document doesn't address Rosario's termination and provides little information about her. In fact, it makes very few claims about Rosario. Here is all the document has to say about Rosario:

> During the time I worked at California Pizza Kitchen, Carla never seemed happy and was frequently upset by the way she was treated by her male managers. All the managers were male, except Carla. It was a very uncomfortable working environment. Mike was extremely rude and dismissive of Carla. When Carla made suggestions, she was dismissed by the male managers. The male managers did not respect Carla and they were jerks to her. I recall one incident when Mike was yelling at Carla in front of people. I was standing a distance away in the dining room. Mike and Carla were standing in the service area in the kitchen. Mike had his hands on his hips, was standing over her and he seemed to be

---

[5] Federal Rule of Civil Procedure 26 says, "a party must, without awaiting a discovery request, provide to the other parties: the name . . . of each individual likely to have discoverable information . . . that the disclosing party may use to support its claims or defenses . . . [and] a copy . . . of all documents . . . that the disclosing party has in its possession, custody, or control and may be used to support its claims or defenses." FED. R. CIV. P. 26(a)(1)(A)(i)-(ii). And Federal Rule of Civil Procedure 37 says, "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion . . . unless the failure was substantially justified or is harmless." FED R. CIV. P. 37(c)(1).

reprimanding her. He was yelling, and I could see that he was talking down to her, even though I could not hear what he said.

*Id.* at 3. None of this suggests that Rosario was terminated on the basis of her gender.

This "affidavit" will not bear the freight Rosario seeks to load onto it. Apparently relying solely on "the Affidavit," Rosario argues that "CPK employees have gone on the record to state that female employe*s* including Rosario were targeted and sexually harassed by the crew of all male managers," and that, "other employee*s* confirmed that Rosario was dismissed by her male counterparts because she is a woman." ECF No. 43 at 8 (emphasis added). But the document does not say that Rosario was "sexually harassed by the crew of all male managers." Nor does it say that Rosario was "dismissed because she was a woman." Moreover, the document does not identify the "male managers" other than Avery and does not explain how they "dismissed" Rosario or "were jerks to her." The only specific event about Rosario recounted in the document is an altercation with Avery, which appears to be the same event as the April 15 incident and which Chiangi could not even hear. Even if it was a different event, it does not add materially to the facts already established, namely, that Avery did not get along with Rosario, yelled at her, and treated her disrespectfully. Nothing in the "affidavit" speaks to Rosario's termination or suggests that it was gender-related. Even if Avery or Tranka harbored gender animus, neither was in a position to terminate Rosario's employment. Tranka and Rosario were both senior managers. ECF No. 35-5 at 45. Avery was a lower-level manager. *Id.* And Rosario has provided no evidence to suggest either of these two played a role in her firing or exerted influence over those who did.

Chiangi's description of Avery's sexual conduct does not advance Rosario's discrimination claim either. Chiangi's version of events does support the notion that Avery sexually harassed other female employees—as do Aguilar's notes of her interview with

10

Ridenour, who said that Avery made sexist comments. *Id.* at 14 ("He will say things like, 'she has a fat ass.' Stuff like that. [']She looks good['] and stuff like that").[6] But this evidence does not suggest he sexually harassed *Rosario* or that she was aware of his sexualized comments or conduct. And, again, neither this evidence nor any other evidence in the record suggests that Avery—who was subordinate to Rosario—had any involvement in her termination. Thus, for the purposes of Rosario's disparate treatment claim, any gender animus Avery harbored is irrelevant. I therefore find that Rosario's discrimination claims fail at the first step of the *McDonnell Douglas* framework. I nevertheless consider the remaining two steps below, on the assumption that she has managed to raise a genuine factual dispute about whether she can make out a *prima facie* case.

### 2. Legitimate, Non-Discriminatory Reason

CPK has met its burden at the second step of providing a legitimate reason for firing Rosario. "Once the plaintiff has established a prima facie case, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for its adverse action." *Bart*, 96 F.4th at 570 (internal quotations and citations omitted). Rosario did not return to work following her leave of absence, and the parties do not dispute that "Aguilar emailed [Rosario], informing her that CPK was separating her employment . . . based on her failure to report to work or communicate with CPK." ECF No. 43-1 ¶ 62. It is obviously legitimate to fire an employee who fails to show up to work. *See Ridgeway v. Royal Bank of Scotland Group*, No. 3:11-cv-976, 2013 WL 1985016, at *21 (D. Conn. May 13, 2013).

---

[6] The statements of Ridenour reflected in Aguilar's notes about what Avery said or did are hearsay and may not be considered in deciding summary judgement, FED R. CIV. P. 56(c)(2), (c)(4), but even if I did consider them, they would not raise a genuine dispute about whether Rosario's termination was gender-based.

### 3. Pretext

Once a defendant provides a legitimate, non-discriminatory reason for the adverse action, "the burden [ ] shifts back to the plaintiff to prove that the employer's stated reason was pretext for discrimination." *Bart*, 96 F.4th at 570 (internal quotations and citations omitted). While Rosario "is not *required* to demonstrate the falsity of the employer's proffered reason, and instead can prevail by proving that an impermissible factor was a *motivating factor*," *Bart*, 96 F.4th at 570 (emphasis in original) (internal quotations and citations omitted), she has failed to do either. Rosario argues that "CPK had substantiated [her] claims . . . yet terminated her when she told them she could not possibly work around Avery considering his prior behavior. That is not a legitimate, non-discriminatory reason for termination." ECF No. 43 at 10. This mischaracterizes the record and also fails to show that *discrimination* motivated CPK's decision to fire Rosario.

CPK *partially* substantiated Rosario's claim about her altercation with Avery, but "was not able to confirm that [ ] Avery treated [her] differently because she was a woman." ECF No, 43-1 ¶ 39-42. CPK took corrective action by counseling Avery, issuing him a written warning, and reminding him of its prohibition against retaliation. *Id.* 43-1 ¶ 43. Moreover, CPK attempted to accommodate Rosario's concerns about working in the same location as Avery by offering her a position at its Westfarms location. *See* ECF No. 43-3 at 2. Nothing about this record suggests that the stated basis of CPK's decision to terminate Rosario was pretextual or that the decision was motivated by her gender. Because Rosario has failed to raise a genuine dispute as to whether she was terminated on the basis of her gender, I grant summary judgment in favor of CPK on the Title VII and CFEPA discrimination claims challenging her termination.

*Hostile Work Environment*

Rosario has not expressly pled a hostile work environment claim. Her complaint does not set forth any separate count for such a claim. Under Title VII, discrimination and hostile work environment "are distinct causes of action governed by different analytical standards." *Desouza v. Office of Children and Family Services*, No. 18-cv-2463, 2019 WL 2477796, at *4 (E.D.N.Y. June 12, 2019). It appears that it was only after CPK, "in an abundance of caution," argued in its motion for summary judgment that any hostile work environment claim would fail, ECF No. 35-1 at 35, that Rosario sought to argue that she was subjected to a hostile work environment. ECF No. 43 at 10. Nevertheless, because CPK has addressed a hostile work environment claim, I will too.

"To prevail on a hostile work environment claim under Title VII . . . a plaintiff must show '(1) harassment that was sufficiently severe or pervasive to alter the conditions of her employment, and (2) a sufficient basis for imputing the conduct that created the hostile environment to her employer.'" *Serrano v. New York State Dep't of Environmental Conservation*, 714 Fed. App'x 90, 91 (2d Cir. 2018) (summary order) (citing *Ferris v. Delta Air Lines, Inc.*, 277 F.3d 128, 136 (2d Cir. 2001)). In addition, "it is axiomatic that in order to establish a sex-based hostile work environment under Title VII, a plaintiff must demonstrate that the conduct occurred because of her sex." *Kelly v. Howard I. Shapiro & Associates Consulting Engineers, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) (internal alterations omitted). CPK argues that the undisputed evidence in the record shows that: (1) the alleged harassment was gender neutral; (2) the alleged harassment was insufficiently severe or pervasive; and (3) there is no basis for imputing liability to CPK.

I agree with CPK as to its last point—and because that point is dispositive, I decline to address the others. "Where a hostile work environment is created by a co-worker who is not a supervisor, the employer can still be liable, but only for its own negligence." *Bentley v. AutoZoners, LLC*, 935 F.3d 76, 92 (2d Cir. 2019) (internal quotations omitted). "To demonstrate such negligence, a plaintiff must adduce evidence that the employer failed to provide a reasonable avenue for complaint or that it knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action." *Id.* (internal quotations omitted). Rosario makes no effort to make such a showing; her brief nowhere argues that CPK failed to provide a reasonable avenue for complaints or that it failed to take reasonable steps to respond to her complaints. *See* ECF No. 43 at 11-12. Instead, she resists the premise that Tranka and Avery were co-workers, arguing that, as managers and agents of the corporation, they were her superiors or were otherwise placed to make CPK liable for their actions. *Id.* Here, she gets the law wrong.

To support her argument that Tranka and Avery were supervisors, Rosario cites *Cajamarca v. Regal Entertainment Group*, which states as follows: "The test for determining whether a particular person is a supervisor is broader in the Second Circuit than in most other circuits. In the Second Circuit, an offender can qualify as a supervisor even if he lacks the authority to make tangible economic decisions concerning the employee . . . the Second Circuit classifies an offender as a supervisor if the authority given by the employer to the employee enabled or materially augmented the ability of the latter to create a hostile work environment for his or her subordinates." 863 F. Supp. 2d 237, 247 (E.D.N.Y. 2012) (internal citations omitted). For this statement of the law, the *Cajamarca* court cited *Mack v. Otis Elevator Co.*, which indeed holds as much. 326 F.3d 116, 126 (2d Cir. 2003). But this portion of the *Mack* opinion was

14

overruled by the Supreme Court in *Vance v. Ball State University*.[7] *See* 570 U.S. 421, 431 (2013) ("We hold that an employer may be vicariously liable for an employee's unlawful harassment only when the employer has empowered that employee to take tangible employment actions against the victim, *i.e.,* to effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits' . . . We reject the nebulous definition of a 'supervisor' . . . substantially adopted by several courts of appeals.").

There is no evidence in the record that Tranka or Avery or any other "male manager" at CPK's Foxwoods location had any authority—or sought to exercise any authority—to "take tangible employment actions" against Rosario. To the contrary, the record reflects that Avery was her subordinate, ECF No. 35-5 at 45, and that Tranka was her equal. ECF No. 43-1 ¶ 3. And the record shows that CPK provided an avenue for complaint and took steps to remediate Avery's misconduct. Following the altercations with Tranka and Avery, Rosario lodged complaints, and CPK's Human Resources Department promptly investigated those complaints. ECF No. 43-1 ¶¶ 10, 17, 33. After these investigations concluded, CPK "coached Tranka and issued him a written warning for raising his voice," ECF No. 35-3 ¶ 12, and "counseled [Avery] on his approach with employees generally, issued him a written warning, and reminded him about CPK's no-retaliation policy." *Id.* ¶ 35.  CPK also informed Rosario of the investigation's conclusions and the remedial action CPK took. ECF No. 43-1 ¶¶ 18, 43, 45, 46.

To be sure, Rosario testified that Tranka and Avery yelled at her or mistreated her on other occasions, but this testimony was vague and included no description of such incidents. *See, e.g.*, ECF No. 43-6 at 14 (Question: "Okay. Well then what incident are you talking about when

---

[7] In any event, *Cajamarca* is not helpful to Rosario's position, as Rosario points to no evidence that CPK "enable[d] or materially augment[d]" Tranka's or Avery's ability to create a hostile work environment.

Mike Avery screamed at you?" . . . Answer: "Yeah. I mean, he did it so many times. I don't know exactly when, how, or whatever. It was – it just was a common behavior towards me from them."). Her testimony that she "complained" about these unspecified other incidents was similarly vague. *See, e.g.*, *id.* at 7 (Question: ". . . So when did you actually report Ryan's conduct?" Answer: "To HR?" Question: "Ever." Answer: "I don't remember the exact time. I reported it many times. I don't remember exact dates."). Further, her testimony does not suggest that any of the complaints she made alleged that Tranka or Avery was sexually harassing her or treating her differently because she was a woman. In the lone specific case in which she made such a complaint—her report to management about the April 15 incident with Avery—CPK investigated and found that Avery had not treated her differently because of her gender. Rosario does not argue that Aguilar's investigation of the Tranka and Avery incidents was in some way perfunctory or a sham, nor does she suggest that the company's disciplinary action against Avery, reminder to him about its non-retaliation policy, and offer to her to work at a different location constituted an unreasonable response to Avery's conduct.

Because Rosario has failed to demonstrate that CPK was negligent in its handling of Tranka or Avery's misconduct, I grant summary judgment in favor of CPK on Rosario's hostile work environment claim.

### B. The Retaliation Claims

To survive a motion for summary judgment, a retaliation claim under Title VII (and CFEPA) must satisfy *McDonnell Douglas*'s burden-shifting framework. That means a plaintiff must first establish a *prima facie* case of retaliation. *See Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012). "If the plaintiff makes out a prima facie case of retaliation, the burden shifts to the defendant employer to articulate a legitimate, non-discriminatory reason for its actions."

*Mitchell v. State Univ. of New York Upstate Med. Univ.*, 723 Fed. App'x 62, 63 (2d Cir. 2018) (summary order) (internal quotations omitted). "If the employer does so, the burden then shifts back to the plaintiff to show that the employer's explanation is pretext for . . . retaliation." *Id.* Rosario argues that she "can establish a claim for retaliation." ECF No. 43 at 12. I disagree. While Rosario has established a *prima facie* case of retaliation as to her complaint against Avery, CPK has provided a legitimate, non-discriminatory reason for her termination, and Rosario fails to provide evidence suggesting that this reason was pretextual or that the termination was otherwise retaliatory.

      1.  *Prima Facie* Case

To establish a *prima facie* case of retaliation, a plaintiff must show "that (1) she was engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and the adverse action." *Lore*, 670 F.3d at 157. CPK argues "that there are no facts to support a finding that [Rosario] engaged in protected activity, that she was subject to a retaliatory action that was materially adverse or that there was a causal connection between any alleged protected activity and any material adverse action." ECF No. 35-1 at 35-36. I disagree with CPK as to the *prima facie* case. As discussed above, the undisputed fact of her termination satisfies the adverse employment action element—even more easily for the retaliation claim, where the burden of showing an adverse employment action is less onerous. *See Burlington Northern and Sante Fe Ry. Co. v. White*, 548 U.S. 53, 54 (2006) ("[T]he proper formulation [of a materially adverse action] requires a retaliation plaintiff to show that the challenged action 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"). Furthermore, while Rosario's complaints against Tranka were not protected activity, there is evidence suggesting that

her April 16, 2022 complaint against Avery was. There is also evidence to suggest a causal connection between that complaint and her termination.

To prove that she was engaged in a protected activity, Rosario "need not establish that the conduct [she] opposed was in fact a violation of Title VII . . . However, [she] must demonstrate a good faith reasonable belief that the underlying challenged actions of the employer violated the law." *Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir. 1988) (internal quotations omitted). In other words, the complaint "must be sufficiently specific to make it clear that the employee is complaining about conduct prohibited by Title VII." *Risco v. McHugh*, 868 F. Supp. 2d 75, 110 (S.D.N.Y. 2012). As to the complaints against Tranka, Rosario has failed to demonstrate that those complaints were based on a good-faith belief that Tranka had engaged in conduct prohibited by Title VII. Rosario was unsure of how many complaints she had filed against Tranka, ECF No. 43-6 at 8-9 ("I can't positively answer that. I mean, approximately, I don't know, six, seven times. I don't know."), and her description of those complaints fails to show she was complaining of discrimination. *See id.* at 10 (Question: "So, what did you say when you made these reports?" Answer: "I told them exactly what was happening to me." Question: "What did you say?" Answer: "I said that, you know, the aggressive behavior, he was screaming at me. You know, I would talk to him, and he would just keep walking like I wasn't even saying anything and that, you know, it made me extremely uncomfortable. I didn't see anybody else, managers getting screamed at and being treated the way I did, except for me. They treated each other just fine but not me."). The Second Circuit has "repeatedly held that generalized grievances about an unpleasant or even harsh work environment, without more, do not reasonably alert an employer of *discriminatory* conduct and therefore fail to rise to the level of protected activity." *Green v. Mount Sinai Health System, Inc.*, 826 Fed. App'x 124, 125 (2d Cir. 2020) (summary

order) (emphasis in original). Nor is there other evidence in the record to suggest that Rosario's complaints against Tranka were based on Rosario's belief that Tranka was discriminating against her on the basis of her gender. This was Rosario's burden to bear. *See Aspilaire v. Wyeth Pharmaceuticals, Inc.*, 612 F. Supp. 2d 289, 308-09 (S.D.N.Y. 2009) ("The onus is on the speaker to clarify to the employer that he is complaining of unfair treatment due to his membership in a protected class and that he is not complaining merely of unfair treatment generally."). Accordingly, Rosario has failed to demonstrate a *prima facie* case of retaliation as to her complaints against Tranka.

Rosario's April 16 complaint against Avery stands on a different footing. First, there is evidence in the record to suggest that the April 16 complaint was protected activity. CPK points to Rosario's admission that, when she submitted her complaint, "she did not claim that the hostile work environment was related to her gender." ECF No. 46 at 2; *see also* ECF No. 43-1 ¶ 34 ("In her complaint, Plaintiff complained that Mr. Avery yelled at her over the Ridenour incident and that Mr. Avery created a hostile work environment, though she did not specifically claim it was related to her gender."). Nonetheless, Aguilar's deposition indicates that Aguilar understood Rosario's complaint as alleging gender discrimination. When asked what Aguilar meant when she said Rosario's allegations were "partially confirmed," Aguilar answered, "It was partially substantiated, her concerns in regards to Mr. Avery. *She claimed that he was treating women differently*. And we were not able to confirm that." ECF No. 35-5 at 87 (emphasis added). Thus, there is evidence that the April 16 complaint put CPK on notice that Rosario believed discrimination was occurring. The April 16 complaint is therefore protected activity. *See Chan v. Donahoe*, 63 F. Supp. 3d 271, 295 (E.D.N.Y. 2014) ("To constitute protected activity, the

plaintiff's conduct must have 'put the employer on notice' that the plaintiff believed that discrimination was occurring.").

Second, the timing between Rosario's complaint and termination gives rise to an inference that the complaint caused the termination, at least at this stage of the analysis. Rosario made her complaint against Avery on April 16, 2022, ECF No. 43-1 ¶ 33, and CPK terminated her on May 28, 2022—six weeks later. *Id.* ¶ 62. In the context of a *prima facie* case, "[a] plaintiff can indirectly establish a causal connection to support a . . . retaliation claim by showing that the protected activity was closely followed in time by the adverse employment action." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010). While the Second Circuit has not defined the outer bounds of temporal proximity, six weeks is sufficiently close in time. *See id.* ("Though this Court has not drawn a bright line defining, for the purposes of a prima facie case, the outer limits beyond which a temporal relationship is too attenuated to establish causation, we have previously held that five months is not too long to find the causal relationship.").

### 2. Legitimate, Non-Discriminatory Reason

Because Rosario has satisfied the elements of a *prima facie* case of retaliation, the burden shifts to CPK to demonstrate a legitimate, non-discriminatory reason for her termination. *See Mitchell*, 723 Fed. App'x at 63 ("If the plaintiff makes out a prima facie case of retaliation, the burden shifts to the defendant employer to articulate a legitimate, non-discriminatory reason for its actions."). CPK argues that it "had a legitimate, non-discriminatory reason for terminating [Rosario] in that [Rosario] abandoned her job and CPK terminated her pursuant to its Attendance policy." ECF No. 35-1 at 39. I agree. As noted above, there is no dispute that CPK informed Rosario that it was terminating her for her failure to report during the hours for which she was scheduled. *See* ECF No. 43-1 ¶ 60 ("On May 24, 2022, [Rosario] did not come to work during her scheduled shift, nor did she report for her shifts on May 25[th], 26[th], 27th, or 28th."); *id.* ¶ 62 ("On

May 28, 2022, Ms. Aguilar emailed [Rosario], informing her that CPK was separating her employment at CPK based on her failure to report to work or communicate with CPK.")*.

### 3. Pretext

Because CPK has demonstrated a legitimate, non-discriminatory rationale, the burden now falls on Rosario to demonstrate that this rationale was pretextual. *See Mitchell*, 723 Fed. App'x at 63 ("If the employer [articulates a legitimate, non-discriminatory reason], the burden then shifts back to the plaintiff to show that the employer's explanation is pretext for . . . retaliation."). Rosario argues that "[w]hether CPK's legitimate non-discriminatory reason for terminating Rosario is pretext for illegal retaliation is a question of motivation, which presents a question of material fact that must be considered by the jury." ECF No. 43 at 14. That is only true, however, if Rosario provides some evidence that would create a genuine dispute as to CPK's motivation. But Rosario proffers only her own conjecture as to CPK's rationale. In her brief, Rosario argues that "CPK terminated Rosario to avoid dealing with her complaints," *id.*, but she cites no evidence for this claim.  Reading Rosario's papers charitably, it appears that Rosario is asking me to infer that because CPK had substantiated some of Rosario's concerns, and because Rosario remained steadfast in her belief that those concerns were unresolved, CPK took the path of least resistance—firing Rosario in lieu of dealing with her. Such an inference is not a reasonable one. If it were, a retaliatory motive could be divined nearly anytime an employee is fired after filing a complaint the employee believed was resolved unsatisfactorily.

The record does contain evidence suggesting that CPK at one point threatened retaliation if Rosario filed *future* complaints. Rosario testified that during a telephone conversation with Aguilar and the regional manager concerning the April 15 incident with Avery, the regional manager told Rosario that "it was up to [her] to make it work, and if . . . [there was] another conversation like this, that he can move for termination." ECF No. 35-5 at 59.  She has also

submitted an email she wrote to Aguilar stating that the regional manager told her that "if there were further problems the phone conversation would not be the same and it would be about termination." ECF No. 43-4 at 2. But these future "problems" never materialized because Rosario never returned to work and thus had no further altercations with Avery—or any other CPK employee. Further, Rosario does not point to any evidence that the regional manager played any role in her termination. And while the termination did follow the regional manager's comment, it followed even more closely Rosario's violation of CPK's attendance policy. Finally, CPK took "steps to ensure [its] anti-retaliation policy [was] enforced," ECF No. 43-5 at 2, and "informed the individuals in question that any retaliation is absolutely forbidden." ECF No. 43-3 at 2. Because Rosario was terminated immediately following her failure to report to work as scheduled for five days in a row, no reasonable juror could find CPK's reliance on its attendance policy as the basis for the termination to be pretextual. I therefore grant summary judgment in favor of CPK on Rosario's Title VII and CFEPA retaliation claims.

## IV.    CONCLUSION

For the reasons set forth above, the Defendant's motion for summary judgment (ECF No. 36) is GRANTED. The Clerk is directed to close this case.

IT IS SO ORDERED.


_____
         /s/
        Michael P. Shea, U.S.D.J.


Dated: Hartford, Connecticut
         September 15, 2025